Robert B. Sykes (#3180)
SYKES MCALLISTER LAW OFFICES, PLLC
311 South State Street, Suite 240
Salt Lake City, Utah 84111
Telephone No. (801) 533-0222
bob@sykesmcallisterlaw.com
*Attorney for Plaintiff*

# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

| | |
|---|---|
| JENNIFER WADE, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>MILLARD COUNTY SHERIFF'S OFFICE, a subdivision of the State of Utah, SERGEANT JERID BENNETT, Millard County Sherriff's Office, MILLARD COUNTY, by and through its Sheriff's Office,<br><br>Defendants. | **COMPLAINT**<br><br>(Jury Demand)<br><br>Case No. _____<br><br>Judge _____ |

Plaintiff JENNIFER WADE ("Jenn"), through counsel, alleges and complains for cause of action against Defendants as follows:

### PRELIMINARY STATEMENT

This is a civil rights action in which Plaintiff seeks relief for Defendant's violations of her rights guaranteed by the United States Constitution, including Title VII of the Civil Rights Act of 1964, §703(a)(1), 42 U.S.C.A. §2000e-2(a)1, and the Fourteenth

1

Amendment, which right is further secured by the Civil Rights Act of 1871, 42 U.S.C. 1983 and 1988. Plaintiff seeks damages, both compensatory and punitive; affirmative and equitable relief; an award of attorney fees, costs, and interest; and other and further relief as this Court deems just and equitable. This is further action at law to redress a deprivation under color of statute, ordinance, regulation, custom, or usage of a right, privilege, and immunity secured to Plaintiff by the Fourteenth Amendment of the Constitution of the United States and arises under the law and statutes of the State of Utah.

## JURISDICTION AND VENUE

1. Jennifer Wade has exhausted her administrative remedies, having filed a charge of discrimination and lack of accommodation with the Equal Opportunity Employment Commission (EEOC).

2. The EEOC issued a Right to Sue letter to Jennifer on March 19, 2024, which was received on or about March 22, 2024. Plaintiff is filing her Complaint within ninety (90) days of receiving the Notice of Right to Sue, or on June 14, 2024.

3. This action arises under the Civil Rights Act of 1964, §703(a)(1), 42 U.S.C. §2000e-2(a)(1).

4. This action seeks redress for violations of the Civil Rights Act of 1964, and jurisdiction is therefore invoked pursuant to 28 U.S.C. §1343.

5. The claims made in this Complaint occurred and arose in the State of Utah in the Central Division. Venue is therefore proper under 28 U.S.C. §1391 and 28 U.S.C. §1331.

6.  Plaintiff is seeking damages under federal law pursuant to the claims for relief specified below, in amounts to be proved at trial.

7.  This Court has authority to award costs and attorney fees pursuant to law.

8.  This Court also has jurisdiction over any pendent State claims Plaintiff may wish to bring, or has brought, pursuant to 28 U.S.C. §1367.

## PARTIES

9.  **Plaintiff Jennifer Wade** (Jenn or Wade), at all times relevant to this Complaint, was an employee of the Millard County Sheriff's Office in the Millard County Jail, and is a resident of Millard County, State of Utah.

10. **Sergeant Jerid Bennett** (Bennett), at all times relevant herein, was a Millard County employee and was acting within the course and scope of his employment, and under color of law.

11. **Millard County** is a political subdivision of the State of Utah. Millard County funds and supervises the Millard County Sheriff's Office ("MCSO") and is legally responsible for acts of the Sheriff's Office and its deputies that are within the course and scope of their employment with the MCSO.  Millard County, through the actions of the MCSO, is a "person" within the meaning of Title VII.

12. **Deputies 1-3**, at all times relative to this Complaint, were employees of the Millard County Sheriff's Office in the Millard County Jail. These Deputies witnessed or experienced the same or similar harassment as Plaintiff.

3

13. All of the acts of the individuals, offices, and departments of Millard County complained of herein, were acts performed under the agency and authority, and pursuant to the color of laws, statutes, ordinances, regulations, policies, customs, or course of dealings of Millard County.

14. Millard County Sheriff's Office is also responsible for any and all actions of its employees and agents toward Wade.

## STATEMENT OF FACTS

15. Jenn began her employment with Millard County on July 19, 2021.

16. Jenn resigned her employment with the Millard County Sheriff's Office on June 15, 2022.

17. Bennett became her supervisor, with full authority to direct the actions, training, and treatment of Jenn. Bennett had authority to recommend discipline for Jenn.

18. In 2021, Jenn started documenting the sexual harassment she received as a Millard County Sheriff's Deputy at the Millard County Jail, and more specifically, from Bennett.

19. Bennett was resistant to train Jenn and other female Deputies and grew increasingly angry and abusive when asked to do so.

20. Bennett reveled in berating female Deputies claiming their efforts were "never good enough" or, failing to recognize suggestions for improvement of services or processes "because a female suggested it."

4

21. Bennett constantly made comments of an unwelcome sexual nature with Jenn and other female Deputies. For example, he often stated that he "liked to be on the bottom." He routinely stated that he hates women and finds them "useless."

22. Bennett called Jenn a "f----ing c--t" in the presence of Deputy Russ Monroe.

23. MCSO and Bennett created, tolerated and encouraged a sexually objectionable environment.

24. This was both objectively and subjectively offensive.

25. A reasonable person would have found this environment hostile and abusive toward women, and one that Jenn so perceived to be hostile and offensive.

26. This hostile and offensive environment involving sexual harassment and abusive conduct is shown by the paragraphs below involving Deputies 1, 2, and 3.

27. **Deputy 1**. Deputy 1 has reported the following abuse by Bennett and the MCSO:

(a) She worked for MCSO before Jenn was hired. She left to go to work at another job which was quite a distance away and left because the harassment at the MCSO became so bad that she could no longer endure the harassment.

(b) Bennett would call her into his office and yell and berate her to the point where she had to ask others to come into the office to reduce the level of harassment.

(c) Bennett made Deputy 1 cry a considerable number of times because of his yelling and berating comments, such that Deputy 1 could no longer tolerate working at MCSO.

28. **Deputy 2**. Deputy 2 worked for the MCSO for many years.

(a) Deputy 2 made comments and suggestions that were designed to make the jail run more efficiently, and they were rejected because she was a woman.

(b) Deputy 2 made suggestions about inmate concerns, and they were ignored because she was a female.

(c) Deputy 2 was repeatedly passed over for promotions to sergeant, due to sexual discrimination while people with much less experience were promoted.

(d) All the promotions done during Deputy 2's tenure have gone to male Deputies.

29. **Deputy 3**. Deputy 3 was sexually harassed at the MCSO as follows:

(a) Deputy Kyle Stevens would call her a "c---" "w----."

(b) He created an Instagram account stating that Deputy 3 was a "slut" and sleeping with "other people's husbands."

(c) When Deputy 3 was moved to Bennett's crew, she was still forced to work with Deputy Stevens and listen to his derogatory comments.

(d) When Deputy 3 worked with Bennett, he would make sexual jokes that made her feel very uncomfortable.

6

(e) Deputy 3 noted that those who would flirt with Bennett about his bad behavior were able to get along with him. But those that did not or stood up to him and told him to cease the harassment, were weeded out.

(f) Deputy 3 had to endure comments about how good "she looked in her uniform," which was also sexual harassment.

(g) Deputy 3 was transferred to dispatch and endured substantial sexual harassment there by road MCSO Deputies who would sit in the dispatch room and make sexual jokes and comments that made Deputy 3 very uncomfortable.

(h) Deputy 3 complained to Lieutenant McDonald and told him what was going on. He promised her he would "look into it" but did not.

(i) Deputy 3 went to the Sheriff Richard Jacobson to complain and was told by the Sheriff to " kick out the guys if they were inappropriate," but that was impossible to do because she needed to stay with the computer and couldn't leave the area to find somewhere safe and less abusive.

(j) Deputy 3 finally quit her job because of the stress and toxicity caused by the abusive, humiliating, and offensive sexual harassment.

30. Jenn complained to Lieutenant McDonald about the harassment and abuse she was receiving. Lieutenant McDonald told her to contact the Sheriff.

31. Lieutenant McDonald told her that the Sheriff wanted to meet with her. She was never able to get that meeting established to make her complaints to the Sheriff despite significant effort.

32. On January 21, 2022, at approximately 16:45 hours, Lieutenant McDonald called Jenn into his office to give her an extension on her employment. She was given a direct order not to show it to anyone. At that time, Jenn wanted to voice her concerns about her hostile and abusive treatment under Bennett. She was told the Sheriff wanted to have a meeting. She stopped talking about it with others thinking she was going to have a meeting with the Sheriff. However, the Sheriff never set that meeting.

33. The Sheriff and Lieutenant McDonald protected Bennett and other abusers from any adverse consequences due to their sexual harassment of female Deputies.

34. Bennett told Deputy Prows to make things as difficult as possible for a new female Deputy sitting in control.

35. Bennett was confronted with these comments and informed that these comments toward Jenn and other Deputies were unwelcome and entirely inappropriate.

36. There is no indication that these complaints about serious sexual harassment went anywhere beyond Bennett as the supervisor.

37. Reports of harassment by Deputies that were sent through proper channels for redress were often lost, resulting in no action.

38. Though known to Bennett, Jenn's hip disability, resulting in a later surgery, was given no accommodation at firearms training and certification range on November 9, 2021.

39. With no explanation from Bennett as her supervisor, accommodation was denied Jenn at the firing range by Deputy Steven Mitchell and Sergeant Blad.

40. The lack of accommodation for her known physical condition and limitations resulted in Jenn not passing the certification.

41. There were no restroom facilities at the firearms range forcing female and male Deputies to relieve themselves in front of fellow officers.

42. Because of the lack of accommodation, Jenn was forced to urinate in front of other male Deputies at the firing range.

## FIRST CAUSE OF ACTION

### ~ Sexual Harassment & Hostile Work Environment ~

### Cognizable Under Title VII Against All Defendants

43. Plaintiff incorporates by reference all other paragraphs in this complaint.

44. The United States Supreme Court held in 1998, as follows:

> So, in *Harris*, we explained that in order to be actionable under the statute, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.

*Faragher v. City of Boca Raton*, 524 U.S.775, 787 (1998) (citations omitted).

45. The Supreme Court further held:

> We directed courts to determine whether an environment is sufficiently hostile or abusive by 'looking at all circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employees work performance.'

*Faragher*, 524 U.S. at 787-788 (punctuation and citations omitted).

46. In order to maintain a claim of sexual harassment, the plaintiff must prove: "sexual harassment so ***severe and pervasive*** as to alter the condition of the [victim's] employment and create an abusive working environment." *Faragher,* 524 U.S. at 786 (emphasis added, citations omitted).

47. Additionally, in order to "be actionable under the statute, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive." *Id.* at 787 (citing, *Harris v. Forklift Systems, Inc.,* 510 U.S. 17 (1993). However, the Court has stated that "offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment." *Id.* at 788.

48. MCSO knew or should have known it was obligated to provide a safe workplace free from sexual harassment and sexually objectionable behavior.

49. Jenn and other female Deputies were not required to endure hostile and sexually objectionable behavior as part of the terms and conditions of their employment.

50. Bennett's conduct, including abusive language, gender-related jokes and sexual innuendos, was of such an extreme nature that it changed the terms and conditions of Jenn's employment

51. Bennett's actions created a hostile and sexually objectionable workplace environment.

52. Jenn and other female Deputies regularly reported Bennett's conduct to MCSO supervisors.

53. Jenn attempted unsuccessfully, on multiple occasions to meet with MCSO administrative and Sheriff Richard Jacobson.

54. Jenn's reports and complaints were ignored by the MCSO administration, including Sheriff Richard Jacobson.

55. As an employee of the Millard County Sheriff's Office, Plaintiff was engaged in protected activity by good faith reporting and complaining about sexual harassment, gender-based discrimination, and a hostile work environment.

56. Defendants' sexual harassment, workplace discrimination, and creation of a sexually objectionable environment at the MCSO have caused Jenn emotional pain, suffering and distress.

57. These actions negatively impacted her professional reputation and limited her career advancement.

58. Jenn has suffered, and will continue to suffer, losses and damages because of the Defendants' conduct.

59. Jenn is entitled to compensatory damages, punitive damages, injunctive relief, and attorney fees and costs.

60. Jenn is entitled to compensation for any other damages as are allowed under the law.

## JURY DEMAND

Plaintiff demands a trial by jury.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

1. For general compensatory damages in an amount to be determined at trial;

2. For special damages as are shown at trial;

3. For punitive damages against Defendants as may be allowed by law;

4. For pre-judgment interest on the damages assessed by the Court, as allowed by law;

5. For Plaintiff's costs and reasonable attorney fees as may be allowed by law;

6. For other damages as allowed by law; and

7. For such other and further relief as the Court deems just and proper.

DATED this 14th day of June, 2024.

**SYKES McALLISTER LAW OFFICES**

  */s/ Robert B. Sykes*
ROBERT B. SYKES
*Attorney for Plaintiff*